**UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**

**PORTLAND DIVISION**

| | | |
|---|---|---|
| **CIANI NATAI BOSTIC,** | ) | |
| | ) | |
| Plaintiff, | ) | 03:10-cv-01153-HU |
| | ) | |
| vs. | ) | **FINDINGS AND** |
| | ) | **RECOMMENDATION** |
| **MICHAEL J. ASTRUE,** | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

_____

Richard A. Sly
rsly@teleport.com
209 SW Oak Street, Suite 102
Portland, OR 97204

Linda S. Ziskin
Ziskin Law Office
P.O. Box 2237
Lake Oswego, OR 97035

    Attorneys for Plaintiff

S. Amanda Marshall
United States Attorney
Adrian L. Brown
Assistant United States Attorney
1000 SW Third Avenue, Suite 600

FINDINGS AND RECOMMENDATION    1

Portland, OR 97204-2902

Terrye Erin Shea
Special Assistant United States Attorney
Office of the General Counsel
Social Security Administration
701 Fifth Avenue, Suite 2900 M/S 221A
Seattle, WA 98104-7075

    Attorneys for Defendant

HUBEL, Magistrate Judge

    Claimant Ciani Natai Bostic ("Claimant") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI") disability payments under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-83f. This court has jurisdiction to review the Commissioner's decision pursuant to 42 U.S.C. § 405(g). Following a careful review of the record, I conclude that the Commissioner's decision should be REVERSED and REMANDED for further proceedings consistent with this Findings and Recommendation and the parameters provided herein.

### I.  PROCEDURAL BACKGROUND

    Claimant protectively filed an application for SSI disability payments on August 24, 2006, alleging an onset date of January 1, 1995.[1] (Tr. 67-68.) Claimant's application was denied initially on December 27, 2006, and upon reconsideration on April 24, 2007. (Tr. 69-72, 80-82.) Claimant requested a hearing before an

---

    [1] Conversely, the ALJ's written decision indicates that Claimant's application was filed on August 18, 2006. (Tr. 14, 21.)

FINDINGS AND RECOMMENDATION    2

Administrative Law Judge ("ALJ"), which was conducted on April 15, 2009. (Tr. 29-66, 83.) A supplemental hearing was held on August 5, 2009. (Tr. 22-28.)

On August 19, 2009, the ALJ issued his decision finding Claimant not disabled. (Tr. 11-21.) On August 25, 2009, Claimant timely requested review of the ALJ's decision. (Tr. 7-10.) On August 4, 2010, the Appeals Council denied this request, making the ALJ's decision the final decision of the Commissioner that is subject to judicial review. (Tr. 1-5.)[2]

## II.   FACTUAL BACKGROUND[3]

Claimant alleges disability based on an affective disorder, anxiety disorder, personality disorder, and/or conduct disorder.

---

[2] Claimant also filed applications for SSI benefits on November 25, 2003, and October 6, 2004, alleging disability onset dates of November 1, 1998 and January 1, 1995. (Tr. 98-99, 101-02.) The applications were denied on May 17, 2004, and December 29, 2004, respectively. (Tr. 85-89, 90-97.) It appears that Claimant did not appeal.

[3] Although the record contains medical evidence from Claimant's previous applications, neither the ALJ nor the parties relied on evidence from the prior applications in this case. At the April 15, 2009 hearing, the ALJ suggested that the inclusion of the "prior SSI files from the past" was unnecessary. (Tr. 33.) As a result, that evidence will not be summarized in the Factual Background of this decision. See Ellis v. Astrue, No. 08-CV-1021, 2010 WL 695654, at *5-6 (E.D. Wis. Feb. 23, 2010) ("the record evidence regarding [claimant]'s prior applications is not pertinent to his current application for [SSI] benefits because he does not . . . seek to reopen prior benefit applications. . . . [Claimant] did not appeal these unfavorable decisions and he cannot now ask for a different decision based on the same evidence."); see also 20 C.F.R. § 416.335 ("the earliest month for which we can pay you benefits is the month you filed the application [for SSI benefits]").

FINDINGS AND RECOMMENDATION     3

(Tr. 67-68, 73.) Claimant has a high school education and a work history that consists primarily of volunteer work at the Oregon Wildlife Reserve. (Tr. 502.) Claimant was twenty-three years old on the date of the hearings before the ALJ. (Tr. 67.)

### A. Summary of the Medical Evidence

### 1. Consultants' Reports

On June 6, 2006, Jill Spendal ("Spendal"), Psy.D., conducted a Learning and Psychological Evaluation on Claimant. (Tr. 500-16.) Spendal began by noting that Claimant has a history of special education classes and struggles with reading, math, and oral comprehension. (Tr. 500.) Claimant also had a "long standing mental health history related to childhood events, including her parents divorce, being taken away from her mother, living with an emotionally unavailable and angry father, and sexual abuse by a step-grandfather." (Tr. 500.) According to Spendal, Claimant described mental health symptoms that are "consistent with both depression and anxiety, as well as possible Axis II disorders." (Tr. 500.)

Claimant graduated from high school the year before Spendal's examination and "has not worked since that time. She spends her time hanging out with a friend, but mostly described herself as being bored. Lately she has been exercising to fill time and to lose weight." (Tr. 501.) Because Claimant was concerned with her weight, she reportedly lost twenty pounds in approximately three to

FINDINGS AND RECOMMENDATION    4

four months.  (Tr. 502.)  According to Spendal, Claimant "appears to be under weight for her age and [] restricting her food intake is not healthy, and while not yet the level of an eating disorder it is problematic and should be monitored by a professional."  (Tr. 503.)

Claimant endorsed the following symptoms consistent with either a dysthymic disorder or major depressive disorder: staying in her room and isolating herself, crying, sleeping more, eating less, poorer concentration, and thoughts of suicide.  (Tr. 503.) She also reported the following symptoms consistent with a possible social phobia or anxiety disorder: extreme nervousness around groups of people or unknown people, fear of going out in the world alone, panic attacks when in public, and difficulty speaking with males, even her own brother.  (Tr. 503.)  With respect to posttraumatic stress disorder ("PTSD"), Claimant reported a history of flashbacks to sexual abuse, hypervigilance of her environment, heightened startle response when alone, avoiding certain places or people that remind her of the abuse, emotional numbness, emotional distance from others, even her mother, and difficulty expressing emotions.  (Tr. 504.)

Spendal administered the following tests during her evaluation:  Structured Clinical Interview; Wechsler Adult Intelligence Scales, Third Edition ("WAIS-III"); Woodcock-Johnson, Third Edition, Tests of Achievement ("WJ-III"), and Millon Clinical

Multiaxial Inventory, Third Edition ("MCMI-III"). (Tr. 505.) In Spendal's opinion, Claimant was cooperative "and appeared to put good effort into all tasks." (Tr. 504.)

Ultimately, Spendal diagnosed Claimant with: Dysthymic Disorder, Social Phobia, PTSD, and Avoidant Personality Disorder. (Tr. 512.) An eating disorder diagnosis was "not currently appropriate[.]" (Tr. 511.) According to Spendal, because there are very few

> employment opportunities that do not involve contact with other people it will be very difficult for C[laimant] to . . . work until she obtains successful treatment for her Social Phobia, PTSD, and Avoidant Personality Disorder. The combination of these disorders makes C[laimant] have significant difficulty attending and comprehending oral communication when around unknown (and sometimes even known) people. She is uncomfortable especially around men (related to PTSD)[.] . . . The avoidant traits cause her to want to avoid most social situations, and the social phobia makes her fear rejection and humiliation in even the most mundane of social situations.

(Tr. 512.) Spendal opined that, "[u]ntil C[laimant] is able to be around people (which will not happen until she can treat her social phobia at least) she is not likely to be able to work in jobs that involve contact with other people. However, she will need pretty intensive training (which requires being around people) due to attentional imitations, making her working a difficult task at this time." (Tr. 515.) Spendal also recommended that Claimant should avoid "jobs or projects" with time deadlines because she would perform "very poorly" on such tasks. (Tr. 516.)

FINDINGS AND RECOMMENDATION      6

On August 28, 2006, Spendal provided an addendum to her June 6, 2006 Learning and Psychological Evaluation. (Tr. 517.) Specifically, she noted that Claimant's "restriction of eating ha[s] now expanded to included purging behavior." (Tr. 517.) As a result, Spendal opined that an Eating Disorder diagnosis needed to be considered and addressed, although a "specific diagnosis" could not be given without further evaluation. (Tr. 517.)

On December 22, 2006, a state agency psychologist, Paul Rethinger ("Rethinger"), Ph.D., completed a Psychiatric Review Technique Form, wherein he evaluated Claimant's impairments under listings 12.04 (affective disorders), 12.06 (anxiety-related disorders), and 12.08 (personality disorders). (Tr. 541-50.) He concluded that the limitations imposed by Claimant's impairments failed to satisfy listing 12.04, 12.06, or 12.08. (551-52.) Rethinger's notes provided that:

> Spendal PsyD, states given that there are few employment opportunities that do not involve contact with other people it would be very difficult for claimant to work until she receives tx for social phobia. Some weight given but not all. Spendal has only seen claimant once or twice and per claimant's adls she does feel comfortable around people she knows and does go out.

(Tr. 553.)[4]

On December 22, 2006, Rethinger also submitted a Mental

---

[4] Rethinger does not specify what evidence in the record supports his conclusion that "per claimant's adls she does feel comfortable around people she knows and does go out." (Tr. 553.)

FINDINGS AND RECOMMENDATION      7

Residual Functional Capacity Assessment, which describes Claimant as "[m]oderately [l]imited" in four of twenty categories of mental activity and "[n]ot [s]ignificantly [l]imited" in fifteen. (Tr. 555-56.) Claimant's "ability to interact appropriately with the general public" was the only category Rethinger rated as "[m]arkedly [l]imited." (Tr. 556.) Rethinger opined that Claimant "is able to understand, remember and carry out simple tasks but due to anxiety would not be able to consistently handle detailed tasks." (Tr. 557.) Rethinger also stated, "[d]ue to anxiety claimant would do best not working with [the] general public and working either independently or in smaller group setting[s]. [Claimant] [c]an do well in small group setting[s] with employees she is familiar with." (Tr. 557.)

## 2. *Claimant's Medical Records*

On November 29, 2000, Claimant's mother, Donna Berjettej ("Berjettej"), completed a Parent/Caregiver Information Form at Trillium Family Services in Portland, Oregon. (Tr. 165.) Berjettej indicated that she was seeking counseling for her daughter as "[p]art of on-going care from treatment received in Minnesota." (Tr. 165.) Berjettej reported that Claimant suffered from the following problems: "Sleeping Problems"; "Poor Attention"; "Withdrawal"; "Depression"; "Low Self-Esteem"; and "Suicide Threats." (Tr. 165.) Berjettej noted that Claimant had been hospitalized on three occasions due to suicide attempts. (Tr. 165,

FINDINGS AND RECOMMENDATION     8

167.)   Berjettej also reported that Claimant suffered from the following types of trauma/stressors: "Neglect", "Sexual Abuse", "Violence in the Home", "Multiple Family Moves", "Emotional Abuse", "Parent Substance Abuse", and "Parents Separated/Divorced." (Tr. 169.) Berjettej hoped that pursuing counseling would help Claimant "become[] more social, less afraid of social situations[.]" (Tr. 171.)

On February 27, 2002, Jonathan Valen, M.D., completed a Discharge Report, which indicated that Claimant had been hospitalized due to "severe depression with suicidal ideation." (Tr. 445.) Claimant stated that "she had significant anxiety and depressive symptoms regarding family issues." (Tr. 445.) Claimant was no longer suicidal while in the hospital. (Tr. 445.) Her mother reported that "she believes that C[laimant]'s difficulties were a direct result of stress at home." (Tr. 445.) Upon being discharged, Claimant was described as "stable" and "no longer endorsing depressive symptoms or suicidal ideation." (Tr. 446.)

A Clackamas County Mental Health Diagnostic Review Form dated February 19, 2003, indicates that Claimant has a

> past history of failing school, and anxiety as well as depression concerns that required hospitalization. C[laimant] has faced multiple challenges in her life such as domestic violence, separation from her primary caregiver during latency and prepubescent ages, sexual abuse during the age of 9 through 12, social and school failure, and more recently a move to a predominantly Caucasian suburb in Oregon from Minnesota.

In response to the multiple stressors and traumas,

FINDINGS AND RECOMMENDATION       9

> C[laimant] has relied on self destructive and avoidant coping patterns w[hich] have severely impacted her ability to perform in school and develop age appropriate interpersonal skills. She has multiple symptoms related to anxiety disorders including intrusive recollections of the past sexual abuse, fears of being taken from her mother, anticipatory anxiety, and fears of being judged by others. Depressive symptoms present are sleep trouble, feeling of hopelessness, low energy, and occasional suicidal ideation.

(Tr. 393-94.)

On August 14, 2006, Cheryl Hickethier ("Hickethier"), M.D., completed a progress note that indicated Claimant's anxiety and PTSD were improving with the use of Cymbalta. (Tr. 540.) Claimant's energy levels had improved as well. (Tr. 540.)

On October 31, 2006, Claimant saw Jennifer Lochner ("Lochner"), M.D., at Oregon Health & Science University ("OHSU") to discuss stomach cramps, which Claimant thought were the result of stress. (Tr. 906.) At that time, Claimant was involved in a program to get a job and reported experiencing "anxiety attacks." (Tr. 906.)

On October 5, 2007, Claimant saw Jonathan Betlinski ("Betlinski"), M.D., at OHSU. (Tr. 904.) Betlinksi's progress notes provide, in pertinent part, that:

> Patient reports she has been feeling more depressed lately. . . . Has been isolating more, staying in her room sketching. . . . Energy low. Sleep is poor; has difficulty falling asleep and staying asleep. Memory and concentration are deteriorating, though she feels this is due to propanolol[.] . . . Has been having suicidal thoughts and thoughts of self-harm, 'but usually I try to distract myself.' Finds this more difficult to do, lately. . . . Anxiety levels have been higher, are

FINDINGS AND RECOMMENDATION    10

generally constant. Generally feels safe only in her room.

(Tr. 904.) Betlinski's notes indicate that Claimant had issues with "Anorexia Nervosa, r/o Bulimia Nervosa"; however, he also stated "[n]o report of problematic eating disorder behaviors today." (Tr. 904.)

In a February 1, 2008 progress note, Betlinski indicated that Claimant's anxiety was "fairly well controlled." (Tr. 889.)

On April 9, 2008, Claimant reported to Betlinski that she felt better after being prescribed a higher dosage of Zoloft. (Tr. 902.) Betlinski noted that Claimant's anxiety was also controlled with propanolol, and she was no longer having suicidal thoughts. (Tr. 902.)

In Betlinksi's April 15, 2008 chart note, Claimant discussed a trip to the beach with friends. (Tr. 884.) Claimant was also looking forwards to the summer "so she can go fishing and camping in Molalla again." (Tr. 884.) Betlinski indicated Claimant has "a history of PTSD, depression and an eating disorder [which] appear[] to be grieving [sic] appropriately." (Tr. 885.) Betlinski found Claimant's anxiety to be "generally low." (Tr. 885.)

On February 5, 2009, Claimant saw Betlinski and reported that she was "[f]eeling much better, which she attributed to applying for [a] job and actually getting an interview." (Tr. 876.) Apparently,

[t]he whole [job search] process scares [Claimant] a

FINDINGS AND RECOMMENDATION    11

> little. Mom has seemed more distant: 'and for some
> reason, I got the feeling she thought I'm going to die.'
> [Claimant] [b]elieves her job hunt may be contributing to
> mom's feelings: 'I don't really know how to comfort her,
> so I just tell her I'm here mom, and I'm not going
> anywhere.'

(Tr. 876.)

On February 26, 2009, Claimant met with Betlinski and reported that she was still looking for a job. (Tr. 874.) Claimant mentioned that "[h]aving SSDI would be nice, but would rather earn her way." (Tr. 874.) Betlinski indicated there was no recurrence of eating disorder symptoms and medications continued to be helpful to Claimant. (Tr. 874.)

### B. Claimant's Testimony

### 1. Hearing Testimony

Claimant's initial hearing was held on April 15, 2009. (Tr. 27.) At that time, Claimant was looking for work and "trying to start" school, but claimed "anxiety kind of stops me from doing any of that." (Tr. 37.) She testified that her anxiety makes her sweat and "get really tense, like, a knot in my stomach kind of feels." (Tr. 38.) Claimant's anxiety also interferes with her ability to enjoy social activities because she feels "nervous all the time." (Tr. 38.) In terms of her ability to focus, Claimant testified that her anxiety is "about an eight or a nine [out of ten]. It's just really hard for me to concentrate on what people are saying sometimes." (Tr. 38.)

FINDINGS AND RECOMMENDATION     12

Claimant's counsel then proceeded with the following line of questions:

> Q   Do you find yourself talking to people and just turning them off or freezing up in the communication?
>
> A   Well, it's, like, I hear them but at the same time I don't when I get too anxious.
>
> Q   So the words come to you but it's as though they're just noise?
>
> A   In a way, yeah.

(Tr. 38-39.)

Claimant indicated she has a few friends and suggested that her anxiety around them varies depending on the length of their relationship.  (Tr. 39.)  Claimant has performed limited volunteer work in the past and ultimately received her diploma from an Adolescent Day Treatment Center ("ADTC").  (Tr. 40.)  When Claimant did attend regular high school she was "always getting detention because I never showed up."  (Tr. 40.)  Attending high school made Claimant "nervous all the time, doing natural things that you're supposed to do in high school."  (Tr. 40.)  Claimant testified she would have difficulty holding down a job since "it would be just high school all over again.  I wouldn't be able to show up because I'm nervous all the time."  (Tr. 44.)

Claimant stated that doctors and/or counselors had diagnosed her with bulimia, social anxiety disorder, and depression.  (Tr. 41.)  As a result of her depression, Claimant often times will

FINDINGS AND RECOMMENDATION    13

isolate herself in her house because she gets "so sick of being nervous all the time so I just stay at home." (Tr. 41.)

In the past Claimant had "self-mutilated or cut [herself]"; however, she stated that this practice ended about two years ago. (Tr. 42.) Claimant believes this behavior is the result of the sexual abuse she experienced as a child. (Tr. 42.) Claimant also stated that she experiences flashbacks on a weekly basis regarding the abuse she suffered. (Tr. 43-44.)

Claimant receives psychiatric treatment at OHSU on a monthly basis. (Tr. 44.) For a little over a year, Claimant has been taking "Zoloft and for anxiety . . . Propranolol." (Tr. 45.) Although Claimant has varied her medication in the past because "didn't really feel anything," she believes Zoloft has helped "a lot more" than other medications. (Tr. 45.) Claimant does not take Propanolol on a regular basis since her "shrink says that, you know, whatever works for you." (Tr. 46.)

Claimant testified she lives at home with her mother, who has not worked for an extended duration of time. (Tr. 47.) Apparently, Claimant has been dating a young man for seven years. (Tr. 46-48.) Claimant and her boyfriend spend their time together watching movies, riding bikes, doing household chores, and shopping. (Tr. 49.) At times, Claimant's friends will pick her up so they can hangout together. (Tr. 50.) Claimant also rides the bus. (Tr. 50.)

FINDINGS AND RECOMMENDATION     14

///

## 2. Written Testimony

On September 19, 2006, Berjettej completed a Function Report on Claimant's behalf. (Tr. 209-16.) Claimant's daily activities were listed as: talking on the phone, watching television, surfing the internet, and attending appointments. (Tr. 209.) Claimant reportedly has no difficulty with personal care, takes care of a pet, and has "never [been] able to work or be around people." (Tr. 210.)

Claimant's condition can make it difficult for her to sleep and cause her to oversleep. (Tr. 210.) She prepares meals on a daily basis, such as salads, cereal, noodles, sandwiches, and frozen dinners. (Tr. 211.) Claimant is also capable of performing household chores, such as cleaning and laundry. (Tr. 211.) Claimants reports that she goes outside "[a]lmost every day" and uses public transportation; however, she does not go out alone because of her "anxiety attacks." (Tr. 212.) Claimant indicates that she goes shopping for food and clothes. (Tr. 212.) Claimant is unable to pay bills, handle a bank account, or write checks, but she is capable of counting change. (Tr. 212.)

Claimant's hobbies and interests consist of drawing, watching television, surfing the net, and arts and crafts. (Tr. 213.) For social activities, Claimant reportedly talks on the phone, rides her bike, and uses the internet on a daily basis. (Tr. 213.)

Claimant stated, "I don't socialize because of the anxiety." (Tr. 214.)

Claimant's condition affects her memory; her ability to complete tasks; her concentration; her understanding; and her ability to follow instructions. (Tr. 214.) She reports that she can pay attention "not long" and cannot follow instructions. (Tr. 214.) Claimant also reportedly "hear[s] voices" and "see[s] things." (Tr. 215.)

### C.    Third-Party Testimony

### 1.    Hearing Testimony

Berjettej testified at the hearing on April 15, 2009. (Tr. 51.) Berjettej confirmed that Claimant's boyfriend lives with them and, despite his own mental disabilities "that he refuses to address," is a positive influence on Claimant. (Tr. 52.) When asked to describe examples of Claimant's functional limitations, Berjettej stated:

> Personally, I see – you have to pardon me. I'm in pain here. But I don't want to embarrass her but I need to let the courts know that I still see a lot of immaturity and –- [] I see her struggling. It's, like, she's in an immaturity-type bag so to speak and she's fighting to get her way out of it. And she needs a lot of assistance with every day life. And she doesn't know how to, she doesn't know how to say, for instance, write a check or pay a bill. When it comes to being in the public [], her anxiety is on high.

(Tr. 51-52.) Berjettej has observed that Claimant's symptoms cause her to "zone" and "kind of stare off into space[.]" (Tr. 53.)

FINDINGS AND RECOMMENDATION    16

Berjettej receives the same reaction from Claimant when she discusses a topic that Claimant "doesn't understand." (Tr. 54.)

Berjettej confirmed that Claimant attended an ADTC; however, it "got closed down from lack of funding, [and] they put her back into Clackamas High[.] . . . And then they also set it up where she was going to different programs around the city. So she would be bussed to different places around the city for schooling." (Tr. 55.) Claimant was not "mainstream[ed]" because of her anxiety and dysthymia. (Tr. 55.)

Berjettej indicated that, prior to leaving Minnesota when Claimant was thirteen, she had lost custody of Claimant for about five years. (Tr. 56.)

According to Berjettej, because Claimant does not have any kind of medical coverage, Betlinksi has been seeing Claimant on a voluntary basis. (Tr. 57-58.)

Berjettej has not worked since 2005 because she has some disabilities of her own, such as dysthymia, fibromyalgia, and heart issues. (Tr. 59.) As a result, the family supports itself with food stamps and a "Section VIII" housing voucher that pays the rent and utilities. (Tr. 59, 61.) Berjettej also has a social security application of her own currently pending. (Tr. 59.)

**2. Written Testimony**

Berjettej completed a Function Report - Adult - Third Party on April 25, 2007. (Tr. 241-58.) In regards to Claimant's daily

activities, Berjettej observed that, "[m]ost of her time is spent sleeping.  She does get up to fix something to eat but the meal may consist of just a carrot. She may spend time with the cat, watching TV, or making her F[i]mo characters."  (Tr. 241.)  Berjettej indicated that Claimant gives her cat baths, but Berjettej cleans the litter box and feeds the cat.  (Tr. 242.)

Because of the side effects of Claimant's medications, "she may stay up all night and sleep all day." (Tr. 242.)  Claimant has no difficulty with personal care, but she does need reminders to take her medications.  (Tr. 242-43.)  If Claimant prepares food, it usually consists of sandwiches or frozen dinners; however, when the family can afford, Claimant "makes (expensive) meals." (Tr. 243.) Claimant is described as "meticulous" when she prepares food and performs household chores, such as cleaning and laundry.  (Tr. 243.)

Based on Berjettej's observations, Claimant rarely leaves their apartment, unless she has an appointment.  (Tr. 244.) Berjettej believes Claimant does not go out alone because of her "extreme anxiety," which surfaces "even . . . when someone comes to visit." (Tr. 244.)  Berjettej indicated, however, that Claimant will go shopping in stores and spend "hours [] searching for the right doll."  (Tr. 244.)  Claimant does not pay bills, handle a bank account, or write checks because she "[d]oes not have the every day logistics of life to handle it . . . or understand it."

FINDINGS AND RECOMMENDATION    18

(Tr. 244.)

With respect to hobbies and interests, Berjettej noted that Claimant "[i]s gifted in art" and enjoys "[w]atching cartoons and making either F[i]mo dolls, drawing, or playing with her dolls." (Tr. 245.) Claimant's social activities consist primarily of time spent with her mother and/or Jeff at home. (Tr. 245.) In fact, Berjettej claims she "never does anything or goes anywhere social[ly]." (Tr. 246.)

Berjettej believes that Claimant's conditions affects her memory; ability to complete tasks; ability to concentrate; ability to understand; ability to follow instructions; and ability to get along with others. (Tr. 246.) According to Berjettej, Claimant does not handle stress well; she gets frustrated and shuts down when her routine changes; and "[t]ends to resort to wanting to be spoiled." (Tr. 247.) Berjettej's final remarks were:

> C[laimant] needs guidance and a lot of understanding. She wants to work so badly and has tried to overcome her 'mental blocks' but for whatever reasons [she cannot] (I know because I have been seeing and witnessing her for the past 9 years that we have since been back together).
>
> I have tried to the best of my ability and I miss the person she used to be when she was years younger – fearless, easy-going- and smart. Now she is just a shell of her former self.

(Tr. 248.)

### D. Vocational Expert's Testimony

On August 5, 2009, the ALJ held a supplemental hearing in

order to take testimony from a Vocational Expert ("VE") after all of Claimant's current medical records had been received. (Tr. 24.) The ALJ began by providing the VE with background information on Claimant. (Tr. 25.) Specifically, that she has been looking for work, was "trying to start school but her anxiety was poor"; received a diploma "at an adolescent day treatment alternative school"; and had no work history to the ALJ's knowledge. (Tr. 25.)

The ALJ asked the VE to consider a hypothetical claimant who has no demonstrated exertional impairments, but has "certain non-exertional impairments such that she would be limited to routine, unskilled work with no public contact." (Tr. 25.) Taking in account Claimant's "age, education and, in this case, no work history," that ALJ asked the VE whether "there [are] other jobs existing in the State in which she resides or the several regions of the country that she could perform?" (Tr. 25.) The VE indicated that, given that hypothetical, there would be three possibilities: a kitchen helper, a warehouse worker, and a hand packer. (Tr. 25-26.)

The ALJ then asked the VE to consider a hypothetical claimant that "has an underlying affective and/or anxiety reaction such that she would be absent from the workplace, but such absences . . . would occur unpredictably . . . [and] could reach two or more days a month." (Tr. 26.) The VE stated that such an individual could not sustain employment in the occupations previously recited. (Tr.

FINDINGS AND RECOMMENDATION    20

26.)

The hearing concluded with Claimant's counsel posing a hypothetical to the VE, which essentially asked if a hypothetical claimant could sustain employment if their symptoms prevented them from working for an hour a day "not in the normal work break periods." (Tr. 27.) The VE testified that an individual with this limitation would not be able to sustain employment. (Tr. 27.)

### III. DISABILITY DETERMINATION AND THE BURDEN OF PROOF

#### A. Legal Standards

A claimant is disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A).

"Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social Security Act." *Keyser v. Commissioner*, 648 F.3d 721, 724 (9th Cir. 2011) (citing 20 C.F.R. § 404.1520)). The Keyser court described the five steps in the process as follows:

> (1) Is the claimant presently working in a substantially gainful activity? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal one of a list of specific impairments described in the regula-tions? (4) Is the claimant able to perform any work that he or she has done in the past? and (5) Are there significant numbers of jobs in the national economy that the claimant can perform?

*Keyser*, 648 F.3d at 724-25 (citing *Tackett v. Apfel*, 180 F.3d 1094,

FINDINGS AND RECOMMENDATION    21

1098-99 (9th Cir. 1999)); *see Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001) (citing 20 C.F.R. §§ 404.1520 (b)-(f) and 416.920 (b)-(f)).  The claimant bears the burden of proof for the first four steps in the process.  If the claimant fails to meet the burden at any of those four steps, then the claimant is not disabled.  *Bustamante*, 262 F.3d at 953-54; *see Bowen v. Yuckert*, 482 U.S. 137, 140-41, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987); 20 C.F.R. §§ 404.1520(g) and 416.920(g) (setting forth general standards for evaluating disability), 404.1566 and 416.966 (describing "work which exists in the national economy"), and 416.960(c) (discussing how a claimant's vocational background figures into the disability determination).

The Commissioner bears the burden of proof at step five of the process, where the Commissioner must show the claimant can perform other work that exists in significant numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and word experience." *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999).  If the Commissioner fails meet this burden, then the claimant is disabled, but if the Commissioner proves the claimant is able to perform other work which exists in the national economy, then the claimant is not disabled.  *Bustamante*, 262 F.3d at 954 (citing 20 C.F.R. §§ 404.1520(f), 416.920(f)); *Tackett*, 180 F.3d at 1098-99).

The ALJ determines the credibility of the medical testimony

FINDINGS AND RECOMMENDATION     22

and also resolves any conflicts in the evidence. *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1196 (9th Cir. 2004) (citing *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)). Ordinarily, the ALJ must give greater weight to the opinions of treating physicians, but the ALJ may disregard treating physicians' opinions where they are "conclusory, brief, and unsupported by the record as a whole, . . . or by objective medical findings." *Id.* (citing *Matney, supra; Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001)). "[T]he Commissioner must provide clear and convincing reasons for rejecting the uncontradicted opinion of an examining physician. . . . [And,] the opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." *Lester v. Chater*, 81 F.3d 821, 830-31 (9th Cir. 1995) (citations and internal quotation marks omitted).

The ALJ also determines the credibility of the claimant's testimony regarding his or her symptoms:

> In deciding whether to admit a claimant's subjective symptom testimony, the ALJ must engage in a two-step analysis. *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996). Under the first step prescribed by *Smolen*, . . . the claimant must produce objective medical evidence of underlying "impairment," and must show that the impairment, or a combination of impairments, "could reasonably be expected to produce pain or other symptoms." *Id.* at 1281-82. If this . . . test is satis-fied, and if the ALJ's credibility analysis of the claimant's testimony shows no malingering, then the ALJ may reject the claimant's testimony about severity of

symptoms [only] with "specific findings stating clear and convincing reasons for doing so." *Id.* at 1284.

*Batson*, 359 F.3d at 1196.

### B.  The ALJ's Decision

#### 1.  Steps One and Two

At Step One, the ALJ concluded that Claimant had not engaged in substantial gainful activity since August 18, 2006, the application date. (Tr. 16.) At Step Two, the ALJ determined that Claimant suffered from the following severe impairments: dysthymic disorder ("dysthymia"), social phobia, PTSD, and avoidant personality disorder.  (Tr. 16.)

#### 2.  Step Three

At Step Three, the ALJ concluded that "[C]laimant's mental impairments, considered singly and in combination," failed to "meet or medically equal[] one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.925 and 416.926)."  (Tr. 16.)  In particular, the ALJ found that Claimant's activities of daily living were only *mildly* restricted. (Tr. 16.)  As to social functioning, the ALJ found Claimant's difficulties to be *moderate*. (Tr. 17.)  With respect to concentration, persistence or pace, Claimant was determined to have "*mild* to moderate difficulties." (Tr. 17.)  As to decompensation, treatment records reflected that Claimant had experienced *no* episodes of decompensation of an extended duration.  (Tr. 17.)

In evaluating Claimant's dysthymia, the ALJ determined that the medical records were not indicative of "repeated episodes of decompensation each of extended duration, a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in environment would cause decompensation, or a current history of [one] or more years inability to function outside of a highly supportive living arrangement." (Tr. 17.) As to Claimant's social phobia and PTSD, the ALJ found that medical treatment records failed to indicate that "these impairments resulted in the claimant's complete inability to function independently outside the area of her home." (Tr. 17.)

### 3. *Claimant's RFC*

After considering the entire record, the ALJ concluded that Claimant has the RFC "to perform a full range of work at all exertional levels but with the following nonexterional limitations: she is limited to routine, unskilled work with no public contact." (Tr. 17.)

While the ALJ agreed that Claimant's medically determinable impairments could reasonably be expected to cause her alleged symptoms, he found Claimant's "statements concerning the intensity, persistence and limiting effects of these symptoms [] not credible to the extent that they are inconsistent with the above [RFC] assessment." (Tr. 18.)

FINDINGS AND RECOMMENDATION     25

In support of his decision, the ALJ summarized the record as follows: Claimant's medical records reflect that she has been diagnosed with several mental health impairments, such as dysthymia, depressive disorder, anxiety disorder, a learning disorder, PTSD, and anorexia. (Tr. 18.) Claimant had been prescribed Prozac, Paxil and Celexa to treat her depression and anxiety symptoms. (Tr. 18.) She also attended individual counseling to further alleviate her symptoms. (Tr. 18.)

After a June 2006 psychological evaluation, Spendal diagnosed Claimant with dysthymia, generalized social phobia, chronic PTSD, and avoidant personality disorder with dependent and borderline features. (Tr. 18.) Spendal opined that Claimant would have difficulty working due to impaired auditory attentional abilities, social phobia, difficulty concentrating, and low academic levels. (Tr. 18.) The ALJ only assigned Spendal's opinion "[s]ome weight" and noted that the described limitations were consistent with his RFC assessment. (Tr. 19.)

Despite Claimant's history of mental impairments, the ALJ found treatment records to reflect improvements in her symptoms with medication. (Tr. 18.) For example, an August 2006 chart note from treatment provider Hickethier stated that Claimant's anxiety and PTSD symptoms improved while taking Cymbalta. (Tr. 18.) In addition, treatment provider Betlinksi noted that, "even when claimant was non-compliant with taking her medications, she

FINDINGS AND RECOMMENDATION    26

remained functional with the ability to look for a job and cook." (Tr. 18.) Significant weight was given to the opinions of Hickethier and Betlinksi. (Tr. 19.)

The opinion of reviewing state agency psychologist Rethinger was also given significant weight. (Tr. 19.) Rethinger "opined that the claimant should not work with the general public but is able to understand, remember and carry out simple tasks." (Tr. 19.) Rethinger's assessment was viewed as consistent with treatment records indicating Claimant suffers from anxiety in public settings and has some difficulty with concentration, persistence and pace. (Tr. 19.)

Berjettej's third-party function report was also considered at the hearing. (Tr. 19.) Overall, the ALJ found Berjettej's observations "generally credible," but considered her statements regarding Claimant's symptoms and limitations "with caution" based on their personal relationship and Berjettej's lack of medical expertise. (Tr. 19.)

As to Claimant's credibility, "records reflect[ed] that her described activities of daily living are not limited to the extent one would expect given her complaints of disabling symptoms and limitations." (Tr. 19.) As a result, because Claimant's symptoms improved when taking prescribed medication, the ALJ found "that the claimant's symptoms are not as limiting as she has alleged." (Tr. 19.)

FINDINGS AND RECOMMENDATION      27

Lastly, Claimant had previously been diagnosed with bulimia. (Tr. 19.) However the ALJ pointed out that a April 2009 chart note reflected that Claimant's eating disorders were in remission. (Tr. 19, 870.) And, treatment records did not reflect that Claimant had been hospitalized or suffered any significant limitation as a result of her eating disorders. (Tr. 19.)

### 4. Step Four

At Step Four, the ALJ noted that Claimant did not have any past relevant work and then proceeded to the fifth and final step. (Tr. 16, 19.)[5]

### 5. Step Five

At Step Five, the ALJ made three initial observations: Claimant was twenty years old when she filed for SSI benefits; she had a high school education; and that transferability of job skills was not an issue because Claimant had no past relevant work. (Tr. 20.) The ALJ thus concluded that, "[c]onsidering the claimant's age, education, work experience, and [RFC], there are jobs that exist in significant numbers in the national economy that the claimant can perform." (Tr. 20.) In response to the ALJ's hypothetical, the VE testified that Claimant was capable of acting

---

[5] *See* 20 C.F.R. § 416 .965(a) (Past relevant work means work that was performed in the last fifteen years, lasting long enough for the claimant to learn the work, and which qualifies as "substantial gainful activity"); 20 C.F.R. § 416.910 (substantial gainful activity is work that involves doing significant and productive physical and mental duties, and is done, or intended, for pay or profit).

as a kitchen helper, warehouse worker, and hand packer.  (Tr. 20.) Each position is classified by the Dictionary of Occupational Titles ("DOT") as medium exertion, unskilled work, and there is availability both regionally and nationally.  (Tr. 20.)  The VE's testimony was deemed consistent with the information contained in the DOT.  (Tr. 20.)

In sum, the ALJ concluded that Claimant "is capable of making a successful adjustment to other work that exists in significant numbers in the national economy.  A finding of 'not disabled' is therefore appropriate[.]"  (Tr. 20.)

### IV.  STANDARD OF REVIEW

The court may set aside a denial of benefits only if the Commissioner's findings are "'not supported by substantial evidence or [are] based on legal error.'"  *Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)); *accord Black v. Comm'r*, 433 Fed. Appx. 614, 615 (9th Cir. 2011).  Substantial evidence is "'more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).

The court "cannot affirm the Commissioner's decision 'simply by isolating a specific quantum of supporting evidence.'"  *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett*

*v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1998)).    Instead, the court

must consider the entire record, weighing both the evidence that

supports the Commissioner's conclusions, and the evidence that

detracts from those conclusions.    *Id.*    However, if the evidence as

a whole can support more than one rational interpretation, the

ALJ's decision must be upheld; the court may not substitute its

judgment for the ALJ's.    *Bray*, 554 F.3d at 1222 (citing *Massachi v.*

*Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007)).

### *V. DISCUSSION*

    Claimant asserts six grounds upon which the ALJ's decision

should be reversed: (1) the ALJ's Step Two and Three findings were

incomplete; (2) the ALJ's RFC assessment was incomplete; (3) the

ALJ inadequately considered Spendal's opinion; (4) the ALJ's

adverse credibility determination was improper; (5) the ALJ

improperly rejected lay witness testimony; and (6) the VE

hypothetical was incomplete.

### A.  *Step Two Severity Finding and Step Three*
### *Listed Impairment Finding*

    Claimant contends that the ALJ erred by failing to consider

her depressive disorder, learning disorder, anxiety disorder, and

anorexia at Step Two of the sequential analysis.    In essence,

Claimant is arguing that the ALJ erred in Steps Two and Three by

failing to follow the procedures proscribed in 20 C.F.R. § 416.920a

for determining whether she has a severe mental impairment and, if

FINDINGS AND RECOMMENDATION    30

so, determining whether that impairment meets or equals any of the listed impairments. Claimant relies exclusively on the Ninth Circuit's decision in *Keyser*, which involved the same alleged errors under Title II's regulations. *Keyser*, 648 F.3d at 725.

In the Title XVI context, the psychiatric review technique described in 20 C.F.R. § 416.920a requires an ALJ to assess a claimant's limitations and restrictions from a mental impairment(s) in four functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation comprise the four functional areas. 20 C.F.R. § 416.920a(c)(3). An ALJ's "written decision *must* incorporate the pertinent findings and conclusions based on the [psychiatric review] technique" and "*must* include a specific finding as to the degree of limitation in each of the functional areas." *Id.* § 416.920a(e)(4) (emphasis added). The functional areas are used to rate the severity of mental impairment(s) at Steps Two and Three of the sequential analysis. *Taylor v. Astrue*, No. 3:10-cv-05891, 2011 WL 5563373, at *4 (W.D. Wash. Oct. 24, 2011) (citing Social Security Ruling ("SSR") 96-8p, 1996 WL 374184)).

In *Keyser*, "the written decision did not document the ALJ's application of the [psychiatric review] technique and did not include a specific finding as to the degree of limitation in any of the four functional areas." *Keyser,* 648 F.3d at 726. Instead, the ALJ simply referenced and adopted a Psychiatric Review Technique

Form ("PRTF") completed by a state agency medical consultant. *Id.* In *Keyser*, "the ALJ did not state his findings as to the four functional areas[.]" *Keyser*, 648 F.3d at 726. The *Keyser* ALJ's analysis at Step Three was also erroneous because he never addressed whether the claimant's mental impairment met or equaled a listed impairment, which was "understandable given the ALJ's adoption" of the state agency medical consultant's "conclusion that the medical impairment was not severe." *Id.* at 727.

I find Claimant's reliance on *Keyser* misplaced. Claimant overlooks the fact that, unlike *Keyser*, the ALJ resolved Step Two in her favor, finding her dysthymia, social phobia, PTSD, and avoidant personality disorder to be severe impairments. *See Gray v. Comm'r Soc. Sec. Admin.*, 365 Fed. Appx. 60, 61 (9th Cir. 2010) (rejecting argument that the ALJ erred at step two by determining certain impairments were nonsevere, because any alleged error was harmless since "the ALJ concluded that [claimant's] other medical problems were severe impairments."); *see also Mondragon v. Astrue*, 364 Fed. Appx. 346, 348 (9th Cir. 2010) ("Any alleged error at step two was harmless because step two was decided in [claimant]'s favor with regard to other ailments.")

Additionally, unlike *Keyser*, the ALJ's written decision is not devoid of reference to the four functional areas, in fact, his decision included "a specific finding as to the degree of limitation in each of the functional areas described in paragraph

FINDINGS AND RECOMMENDATION    32

(c) of this section." 20 C.F.R. § 416.920a(e)(4). Specifically, an ALJ must rate the first three functional areas (activities of daily living; social functioning; and concentration persistence, or pace), using the following five-point scale: None, mild, moderate, marked, and extreme. *Id.* § 416.920a(c)(4). The ALJ assigned these three functional areas ratings of mild, moderate, and mild to moderate, respectively. (Tr. 16-17.) The fourth functional area (episodes of decompensation), is rated on the four-point scale: None, one or two, three, four or more. *Id.* § 416.920a(c)(4). The ALJ determined that Claimant experienced "no episodes of decompensation." (Tr. 17.)

In short, the ALJ did not commit error at Step Two, or alternatively, if he did, the error was harmless.

Next, Claimant argues that the ALJ failed to conduct a proper Step Three analysis because even non-severe impairments must be considered in determining if she met or equaled a listed impairment. (*See* Pl.'s Reply Br. at 4) ("The ALJ's lack of findings as Step 2 taints his subsequent findings at Step 3, because the ALJ must consider all impairments in combination when determining whether the claimant's total condition meets a Listing.") At the outset, I note that Claimant did not specifically challenge the ALJ's Step Three finding in her opening brief. Typically, arguments raised for the first time in a reply brief are waived. *Rigsby v. Astrue*, No. CV 09-00309-EJL-REB, 2010 WL

3735672, at *4 n.1 (D. Idaho Aug. 24, 2010).  However, for completeness sake, I will consider this additional argument here.

At Step Three, the ALJ must determine whether any of a claimant's impairments or combination of impairments meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Bowen*, 482 U.S. at 141.  Here, the ALJ specifically found that Claimant's "mental impairments, considered singly and in combination," did not meet or equal any of those on the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, particularly listed diagnosis 12.04 (affective disorders), 12.06 (anxiety-related disorders), and listing 12.08 (personality disorders).  (Tr. 16.)

A claimant bears the burden of proving she has an impairment that meets or equals the criteria of an impairment listed in Appendix 1 of the Commissioner's regulations. *Burch v. Barnhart*, 400 F.3d 676, 683 (9th Cir. 2005).  To meet this burden a claimant must offer a "theory plausible or otherwise, as to how h[er] [impairments] combined to equal a listed impairment." *Lewis v. Apfel*, 236 F.3d 503, 514 (9th Cir. 2001).  That is to say, a claimant should "specify which listing she believes she meets or equals . . . [and] set forth any evidence which would support the diagnosis and findings of a listed impairment." *Burch*, 400 F.3d at 683.

FINDINGS AND RECOMMENDATION     34

Although Claimant contends that the ALJ's Step Three impairment finding was tainted, she does not specify which listing she believes she meets or equals. Nor does she cite any evidence she claims would support the diagnosis and findings of a listed impairment. *See Tobin v. Astrue*, No. C 10-02937, 2011 WL 3739537, at *10 (N.D. Cal. Aug. 23, 2011) (holding that "a terse finding that the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments" was sufficient under *Burch*); *Mehrnoosh v. Astrue*, No. CV-10-52-HZ, 2011 WL 2173809, at *9 (D. Or. June 2, 2011) (finding no error at step three because the plaintiff did not cite evidence in the record supporting her argument that her impairment was severe enough to meet or equal a listing, nor did she identify a particular listing the ALJ should have discussed in the alternative.)

Accordingly, the ALJ did not err in determining whether Claimant's impairments met the requirements of a listing.

### B.  Residual Functional Capacity Determination

As part of his Step Four determination, the ALJ determined Claimant's RFC. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1445; SSR 96-8p, 1996 WL 374184. Claimant's objections to the RFC can be divided into two categories. She argues that the ALJ ignored some and improperly rejected other evidence of the extent of her impairments.

The ALJ concluded that Claimant "has the [RFC] to perform a full range of work at all exertional levels but with the following nonexertional limitations: she is limited to routine, unskilled work with no public contact." (Tr. 17.)  I first consider whether this evaluation ignored or improperly rejected certain pieces of medical evidence.

Claimant argues that the ALJ erred by not giving proper weight to the opinion of Spendal, Claimant's examining psychologist.  It is well settled that "the opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record."  *Lester*, 81 F.3d at 830-31.

After evaluating Claimant, Spendal opined that she had the following "barriers to employment:"

- <u>Self-Direction</u>: [Claimant] has the intelligence to be self-directed in the workplace; however, her impaired auditory attentional abilities and tendency to 'space out' which is likely related to the PTSD and lack of coping skills, all mean she will struggle with self-direction.  Her dependent features also mean she may struggle to initiate tasks on her own and will likely need closer supervision and guidance than others her age. However, until she gets her social phobia under more control having closer supervision will be difficult since more contact with people, especially someone in a role to critique

FINDINGS AND RECOMMENDATION    36

her, will be very difficult and may bring on symptoms of panic, depersonalization/dissociation, or 'zoning out'.

- <u>Work Skills</u>: [Claimant] will do approximately equally well in jobs that are verbal and that are visual although with a slight preference for visual tasks. At this time if she had to go to work tomorrow she would need a job with virtually no contact with other people and a job with minimal reading, writing, or math requirements, as well as no timed tasks. She will be slower than average to learn new information due to mental health induced limitations in attention and processing speed. She will need repetition and specialized supervisory strategies.

- <u>Interpersonal Skills</u>: This is where [Claimant] will likely struggle the most. She fears and desires social contact at the same time, but more often her fear wins out and she feels more comfortable isolating herself and limiting social contact. Social situations tend to bring on panic symptoms (or an episode of 'zoning out') and her flat affective style and minimal nonverbal communication (secondary to PTSD) may make her appear unusual to others and cause strain in forming relationships. [Claimant] keeps people at an arms length and suppresses her emotions out of fear and insecurity in her skills to handle both people and her own emotions. Until she learns how to do both things successfully her interpersonal

skills will be limited.

• <u>Communication</u>: [Claimant] will miss pieces of oral communication due to her anxiety fogging her concentration. She will also have more difficulty than her age peers generating and reading written communication due to her suppressed functional academic skills. Communication will need to be both oral and in writing, and in an oral format repetition will be necessary.

• <u>Work Tolerance</u>: [Claimant]'s work tolerance at the current time would be severely limited by her anxiety, depression, and Axis II symptoms [e.g., Avoidant Personality Disorder, with dependent and borderline features]. She would likely need a very part time schedule and frequent breaks during the day.

(Tr. 513-15.) Based on Claimant's diagnoses, Spendal stated, "[u]ntil C[laimant] is able to be around people (which will not happen until she can treat her social phobia at least) she is not likely to be able to work in jobs that involve contact with other people." (Tr. 515.)

In his written opinion, the ALJ accorded "[s]ome weight" to Spendal's 2006 Learning and Psychological Evaluation. (Tr. 19, 500.) He noted that Spendal diagnosed Claimant with dysthymia, social phobia, PTSD, and avoid personality disorder, and opined that Claimant "would have difficulty working due to impaired auditory attentional abilities, social phobia, difficulty

FINDINGS AND RECOMMENDATION    38

concentrating, and low academic levels." (Tr. 18.)  The ALJ merely concluded by stating,"[t]he limitations indicated by this examining physician [are] consistent with the [RFC] determined in this decision."  (Tr. 19.)  Nothing more.

As an initial matter, the limitations identified by Spendal, on their face, are not entirely consistent with the ALJ's RFC determination.  For example, Spendal indicated that Claimant's social phobia needed to be treated before she would be able to work in jobs that involve contact with other people; that her work tolerance would be severely limited by her mental impairments; and that she would need a very part time schedule.  Simply limiting Claimant to routine, unskilled work with no public contact does not properly encompass Spendal's opinion.

The Commissioner argues that "all of the limitations the ALJ did not adopt were premised with words such as 'likely' and 'recommendations' rather than imperative definite.  T[hus,] [t]he ALJ did not err in not relying on limitation[s] that were provided as likely or recommendations." (Def.'s Br. at 14.) Even assuming, *arguendo*, all of the omitted limitations were premised by such words, I disagree.  *See Yeatman v. Astrue*, No. 3:10-cv-05443-KLS, 2011 WL 1153535, at *3 (W.D. Wash. March 28, 2011) (determining that the ALJ erred in giving "some weight" to an examining psychologist's opinion because he failed to mention certain limitations identified by the doctor, such as "that it was

FINDINGS AND RECOMMENDATION      39

'unlikely' that [claimant] could maintain a competitive pace or tolerate the typical pressures or interpersonal demands of employment.")

In short, by failing to give any reason to discount Spendal's opinion, the ALJ fell short of presenting specific and legitimate reasons supported by substantial evidence in the record. Without more, I cannot conclude that the ALJ properly evaluated the medical evidence provided by Spendal, nor can I confidently conclude that no reasonable ALJ could have found Claimant disabled for all or part of her alleged period of disability when fully crediting Spendal's opinion. *See Garcia v. Astrue*, No. CV 10-03827, 2011 WL 4500072, at*5 (C.D. Cal. Sept. 28, 2011) (holding that an ALJ's error was not harmless when he failed to mention, or give reasons for rejecting, an examining psychiatrists opinion).

Claimant also asserts the ALJ's assessment of her RFC was incomplete in that the ALJ did not include some of the limitations identified by Rethinger. (Pl.'s Opening Br. at 6.) However, I need not address Claimant's argument concerning portions of Rethinger's assessment because, as discussed further below, the ALJ is to reconsider Spendal's opinion and the ultimate RFC determination on remand. Rethinger's assessment will be part of the record to be considered on remand.

### C. Claimant's Credibility

Next, Claimant argues the ALJ erred by improperly failing to

credit her subjective complaints.  In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record, including, *inter alia*, medical records, lay evidence, and "the effects of symptoms including pain, that are reasonably attributed to a medically determinable impairment."  *See* SSR 96-8p, 374184, at *5; *accord* 20 C.F.R. § 416.945(a)(3).  If the record established the existence of a medically determinable impairment that could give rise to the reported symptoms, an ALJ must make a finding as to the credibility of the claimant's statement about the symptoms and their functional effect.  SSR 96-7p, 1996 WL 374186, at *1; 20 C.F.R. § 416.929.

Where, as here, there is no evidence that a claimant is malingering, an ALJ's determination that the claimant is not credible must be based on clear and convincing reasons.  *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 693 (9th Cir.2009). The ALJ must specify what testimony is not credible and what evidence undermines it.  *Parra v. Astrue*, 481 F.3d 742, 750 (9th Cir. 2007); *see also Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007) ("[T]he ALJ can reject the claimant's testimony concerning the severity of her symptoms only by offering, specific, clear and convincing reasons for doing so.")

The ALJ found that Claimant's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the

FINDINGS AND RECOMMENDATION    41

intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with" her RFC. (Tr. 18.)   The ALJ provided two specific reasons for his adverse credibility finding.   First, the ALJ determined that Claimant's treatment "records reflect her described activities of daily living are not limited to the extent one would expect given her complaint of disabling symptoms and limitations." (Tr. 19)

Second, the ALJ determined that "treatment records reflect that the claimant's symptoms improve when she takes prescribed medication."   (Tr. 19) (citing Tr. 519, 870.)   For example, in chart note dated August 2006, Hickethier noted that Claimant's anxiety and PTSD symptoms improved with Cymbalta.   (Tr. 18, 519.) Similarly, Betlinski's April 2009 chart note provides, in pertinent part, that:

> [Claimant is] [f]eeling much better now that she's made it a point to take her [medication] every day. More positive, less overwhelmed. Sleep is OK. No vomiting or other problems associated with her eating disorder. More optimistic. . . . Mood 'better.' Affect fairly euthymic, with appropriate range and reactivity. Thoughts relevant, fairly rational, goal-directed. Future oriented. . . . [Claimant has] a history of PTSD, depression and an eating disorder (most likely anorexia) improved with return to medications as prescribed.

(Tr. 870.)

The parties do not dispute whether the evidence considered by the ALJ was appropriate for assessing a claimant's credibility. *See* SSR 96-7p, 1996 WL 374186, at *3 (setting forth factors to consider when assessing credibility, including daily activities and the

FINDINGS AND RECOMMENDATION     42

effectiveness of any medication the individual takes or has taken to alleviate symptoms). As the Ninth Circuit previously has explained, the ALJ is permitted to consider daily living activities in his credibility analysis; however, "[t]he ALJ must make specific findings relating to the daily activities and their transferability to conclude that a claimant's daily activities warrant an adverse credibility determination." *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007) (internal quotation marks and citations omitted; alterations deleted). Put another way, "daily activities may be grounds for an adverse credibility finding 'if a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting.'" *Id.* (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).

The Commissioner concedes that the "boilerplate" language utilized in the ALJ's written decision "may not be a model of clarity," but nevertheless argues that he provided clear and convincing reasons for rejecting Claimant's testimony. (Def.'s Br. at 9.) He claims this case parallels *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 599-600 (9th Cir 1999). (Def.'s Br. at 11-12.) *Morgan* is clearly distinguishable, however. There, "[t]he ALJ pointed to specific evidence in the record . . . identifying what testimony was not credible and what evidence undermined [the claimant]'s complaints," *id.* at 599, such as "the contradictions

FINDINGS AND RECOMMENDATION    43

between [the claimant]'s reported activities and his asserted limitations[.]" *Id.* at 600.

In this case, however, Claimant's Adult Function Report does not contradict her allegations, in fact, it makes clear that Claimant does not go out alone or socialize due to her anxiety, nor has she ever been able to be around unfamiliar people. (Tr. 210, 212, 214.)

Additionally, the ALJ failed to make specific findings regarding the transferability of Claimant's daily activities. While in a general sense many of the activities delineated in the adult function report are indicative of the physical capacity to be employed, they cannot be said to bear a meaningful relationship to the activities Claimant would have the most difficulty performing in the workplace, *e.g.*, social interactions which trigger her social phobia and anxiety-related symptoms. *See Johnson v. Astrue*, No. CV-10-3052-CL, 2011 WL 4501230 (D. Or. Sept. 27, 2011) ("If a claimant's level and type of activity [are not] inconsistent with her claimed limitations, her activities have [no] bearing on her credibility." (citing *Fair*, 885 F.2d at 603))). Because the transferability of Claimant's daily activities are attenuated by the aforementioned observation, I cannot say the ALJ provided sufficient reasons based on substantial evidence for rejecting Claimant's credibility.

Moreover, I agree with Claimant that the ALJ's finding that

FINDINGS AND RECOMMENDATION     44

Claimant is not credible based upon his RFC disregards the role of the credibility analysis in determining an RFC.   In *Carlson v. Astrue,* 682 F. Supp. 2d 1156 (D. Or. 2010), "the ALJ first found [the claimant]'s testimony 'not credible to the extent' his statements 'are inconsistent with the' RFC." *Id.* at 1167. *Carlson* held that "the ALJ's analysis reverses the manner in which he must consider credibility.   The ALJ must consider a claimant's credibility in the course of assessing a claimant's RFC." *Id.* (citing 20 C.F.R. § 416.945(a)(3); SSR 96-8p at *7)).   Thus, the ALJ's analysis was flawed because "[n]o authority suggests an ALJ may reason that a claimant is not credible based upon the claimant's RFC assessment." *Id.*

Similarly, in this case, as in *Carlson*, the ALJ first found that Claimant's statements concerning the intensity, persistence and limiting effects of her symptoms were "not credible to the extent they are inconsistent with the above [RFC] assessment." (Tr. 18.)   I have found no authority, nor is any offered, that permits an ALJ to evaluate a claimant's credibility based upon whether their statements are construed as consistent with the ALJ's subsequent RFC assessment.

In summary, the errors concerning the evaluation of Claimant's credibility compel remand.

### D.   Evaluation of Third-Party Testimony

Next, Claimant argues that the ALJ failed to properly consider

Berjettej's observations concerning her limitations and "used legally unsupportable [reasons] to reject her statements." (Pl.'s Opening Br. at 17.) The ALJ stated that he considered Berjettej's third-party function report and her hearing testimony. (Tr. 19.) The ALJ found Berjettej's observations "generally credible," but determined that "her statements concerning the claimant's symptoms and limitations are considered with caution because of her personal relationship with the claimant and lack of medical expertise." (Tr. 19.)

In determining whether a claimant is disabled, an ALJ is required to consider lay witness testimony concerning a claimant's ability to work. *Bruce v. Astrue*, 557 F.3d 1113, 1115 (9th Cir. 2009). Such testimony is competent evidence which cannot be disregarded without providing specific reasons that are germane to each witness. *Stout v. Comm'r of Soc. Sec.*, 454 F.3d 1050, 1054 (9th Cir. 2006).

In *Heide v. Astrue*, 369 Fed. Appx. 775 (9th Cir. 2010), the Ninth Circuit recognized that, although it is improper to reject lay witness testimony based on lack of medical expertise, when other legitimate reasons have been offered, this error is harmless. *Id*. at 777. Here, the ALJ only offers two reasons to reject Berjettej's testimony: she lacks medical expertise and she is Claimant's mother. "The Commissioner concedes that to reject lay witness testimony because of the witness's personal relationship

with the claimant and lack of medical expertise *is improper*[.]"
(Def.'s Br. at 13) (emphasis added).

Nonetheless, the Commissioner cites *Bayliss v. Barnhart*, 427
F.3d 1211, 1218 (9th Cir. 2005), for the proposition that I should
"infer the inconsistency with the medical evidence was a germane
reason sufficient to discredit lay witness testimony." (Def.'s Br.
at 13.)   In *Bayliss*, the ALJ accepted lay witness testimony that
was consistent with the objective evidence in the record, and
rejected testimony that was not.   *Id.*   Nowhere in the *Bayliss*
decision does the court suggest that they inferred the ALJ's
reasons.   In fact, the only case *Bayliss* cited on this matter was
*Lewis v. Apfel*, 236 F.3d 503 (9th Cir. 2001), where it was stated
that the ALJ must "*expressly* . . . disregard [lay] testimony and
give reasons germane to each witness for doing so."   *Id.* at 511
(emphasis added). Inferring such reasons would clearly be improper
and Berjettej's statements should be considered on remand.

### E.  Vocational Expert Hypothetical

Finally, Claimant argues that the hypothetical situation
proposed to the vocational expert by the ALJ failed to take into
account all of Claimant's limitations.

By erroneously rejecting, *inter alia*, Claimant's testimony and
lay witness statements, the ALJ improperly omitted certain
limitations from the RFC that were arguably supported by the
record.   *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir 1988)

FINDINGS AND RECOMMENDATION    47

("Hypothetical questions posed to the vocational expert must set out all the limitations and restrictions of the particular claimant[.]") Absent additional, legitimate reasons for rejecting such evidence, the ALJ asked the VE a hypothetical at Step Five that was based on an incomplete set of assumptions. The omissions rendered the question posed, and the VE's response, legally deficient and of no evidentiary value. *Robbins*, 466 F.3d at 886 (recognizing that hypotheticals based on an incomplete set of limitations are legally inadequate and the VE's responses have no evidentiary value). Accordingly, the ALJ's determination that Claimant was not disabled, which was based on the VE's testimony was erroneous. *See also Stillwater v. Comm'r of Soc. Sec.*, 361 Fed Appx. 809, 812-13 (9th Cir. 2010) (holding that ALJ's hypothetical posed to the VE was deficient when, as here, it was based on the improper rejection of a doctor's opinion, the claimant's testimony, and lay witness statements).

### F.   Remand

It is within the discretion of the court whether to remand a case for further proceedings or for the immediate payment of benefits. *Benecke v. Barnhart*, 379 F.3d 587, 590 (9th Cir. 2004). "[A] remand for further proceedings is unnecessary if the record is fully developed and it is clear from the record that the ALJ would be required to awards benefits." *Holohan*, 246 F.3d at 1210. However, it is appropriate to remand for further proceedings in a

FINDINGS AND RECOMMENDATION    48

case in which the ALJ has simply failed to articulate acceptable reasons for discrediting and/or rejecting certain evidence, and adequate findings remain necessary for determining eligibility for disability benefits. *See Light v. Soc. Sec. Admin.*, 119 F.3d 789, 793 (9th Cir. 1997).

I conclude that significant issues remain that must be resolved before a determination of disability can be made, and that further proceedings will be useful. *See Stillwater*, 361 Fed. Appx. at 812-13 (remanding for further proceeding after the ALJ improperly rejected a doctor's opinion, the claimant's testimony, and lay witness statements). On remand, after evaluating the evidence in accordance with the standards identified above, the ALJ should reconsider the hypothetical and the ultimate RFC determination.

## VI. CONCLUSION

For the foregoing reasons, I recommend that the decision of the Commissioner regarding Claimant be REVERSED and REMANDED for further proceedings consistent with this Findings and Recommendation and the parameters provided herein.

## VII. SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due **February 27, 2011.** If no objections are filed, then the Findings and Recommendation will go under advisement on that date. If objections are filed, then a

FINDINGS AND RECOMMENDATION    49

response is due **March 15, 2011.** When the response is due or filed,
whichever date is earlier, the Findings and Recommendation will go
under advisement.

Dated this 8th day of February, 2012.


                                     /s/ Dennis James Hubel

                                Dennis James Hubel
                                Unites States Magistrate Judge

FINDINGS AND RECOMMENDATION      50